## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-00077** |
| **v.** | : | |
| | : | |
| **MELODY STEELE SMITH** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### MOTION TO TRANSFER VENUE

Defendant, Melody Steele Smith, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue[1] in this case to a district outside of the District of Columbia. Smith fails to establish that she "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny her motion.[2]

### BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol

---

[1] Smith filed two separate Motions for Transfer of Venue [ECF Nos. 34 and 35]. After reviewing the motions, it appears that the motions are substantively the same and duplicative filings.

[2] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. *See United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

On January 3, 2021, Smith traveled from her residence in Virginia to Washington D.C. with three friends.  After missing the "Save America" rally, she walked to the U.S. Capitol, where she saw metal barricades and members of law enforcement keeping the large crowd of individuals off U.S. Capitol grounds.  After climbing a wall to take pictures, Smith entered the Capitol through the Senate Wing doors.  While inside the Capitol, Smith was hit in the ankle with a rubber bullet fired by law enforcement officers attempting to empty the building.  Nevertheless, Smith remained inside the Capitol and entered the office suite belonging to U.S. Speaker of the House Nancy Pelosi, where she remained for five minutes and took pictures of herself.  Officers ushered Smith out of the Capitol after she had been inside approximately 45 minutes.

Based on her actions on January 6, 2021, Smith was charged with  violations of 18 U.S.C. §§ 1512(c)(2) and 2, Obstruction of an Official Proceeding; 18 U.S.C. § 1752(a)(1), Entering an Remaining in a Restricted Building or Grounds; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(C), Entering and Remaining in Certain Rooms in the Capitol Building; and 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building.  ECF No. 8.

Smith now moves for a change of venue.  ECF Nos. 34 and 35.  She contends that prejudice should be presumed in this district for six primary reasons: (1) the number of federal employees living and working with the District of Columbia, (2) the political makeup of the District of Columbia jury pool; (3) the impact of January 6 on Washington, D.C., (4) the results of surveys of potential jurors, (5) the results of a media analysis conducted by Select Litigation, and (6) pretrial

publicity surrounding the events of January 6.  Each of the Smith's arguments is without merit, and the motion should be denied.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I.    The District of Columbia's Political Makeup Does Not Support a Presumption of Prejudice.

Smith contends that she cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election. ECF No. 35 at 15.  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of Smith's connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted

to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

## II.    The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.

Smith contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew. ECF No. 35 at 14-15. But January 6 is now more than a year in the past. Many D.C. residents do not live or

work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

## III.    The Number of Federal Employees Who Reside in the District of Columbia Does Not Support a Presumption of Prejudice.

Smith argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members.  ECF No. 35 at 11-16.   But Smith does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror.  Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected.  Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time.  And the

storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017. OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/. But many federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

## IV. The Polls Submitted by the Defendant Do Not Support a Presumption of Prejudice.

Smith relies on two polls conducted by at the request of defendants in other cases. ECF No. 35 at 4-10. The first poll was conducted by Select Litigation, a private litigation consulting firm, which conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions. The second poll was conducted by In Lux Research ("ILR"), which conducted a telephone poll of potential jurors in the

District of Columbia and in four other jurisdictions: the Ocala Division of the Middle District of

Florida, the Eastern District of North Carolina, and the Eastern District of Virginia.  Neither of

these polls supports a change of venue.

### A. Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.

Smith argues that this Court should find a presumption of prejudice based on two polls of

prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of

effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL

8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on

the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll

percentages . . . decide the question of a presumption of prejudice."  *In re Tsarnaev*, 780 F.3d 14,

23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that,

"[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial

court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of

a pre-voir dire survey.  *Haldeman*, 559 F.2d at 64.  In *Haldeman*, seven former Nixon

administration officials (including the former Attorney General of the United States) were

prosecuted for their role in the Watergate scandal.  *Id.* at 51.  According to a poll commissioned

by the defense in that case, 93% of the Washington, D.C. population knew of the charges against

the defendants and 61% had formed the opinion that they were guilty.  *Id.* at 144, 178 n.2

(MacKinnon, J., concurring in part and dissenting in part).  Recognizing that the case had produced

a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the

district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of

venue," *id.* at 63-64.  The court observed that the district court "did not err in relying less heavily

on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire.  In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were.  *Campa*, 459 F.3d at 1157 (Birch, J., dissenting).  The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt.  *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.  Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786.  And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out

prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed.  First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses.  *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions).  Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395.  Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it.  But that is not the ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case."  *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And Smith has not offered any reason to depart from that usual practice here.  Thus, this Court need not give

substantial weight to the polling when considering whether to presume prejudice. But, as explained below, the polls submitted by Smith do not support a presumption of prejudice in any event.

**B.      The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to Smith's contention, the Select Litigation poll does not support a presumption of prejudice in this District. That poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error. ECF No. 35-1 at 1-2, 14. The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* at 14. The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta. *Id.* at 14. This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

Smith points out (ECF No. 35 at 6) that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them. *See* ECF No. 35-1 at 14. The survey failed, however, to identify (much less define) any of the charges brought against Smith. It also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead

gave respondents a binary choice between "guilty or not guilty." ECF No. 35-1 at 14. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2. The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.* Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.* Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty." ECF No. 35-1 at 14 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty." Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not

guilty." ECF No. 35-1 at 14. In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.* Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know." This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Smith points out (ECF No. 35 at 10) that, according to the Select Litigation poll, 84% of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6." ECF No. 35-1 at 14. Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6." *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view. And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

Smith also points out (ECF No. 35 at 10) that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals." ECF No. 35-1 at 14 (Question 10). The answers to this question likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes. But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of

those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court.  Moreover, the question demonstrates that fully 28% of D.C. respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to answer.  ECF No. 35-1 at 14.  And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels (*see* ECF No. 35-1 at 15)—would not justify the conclusion that this is an "extreme case" in which a change of venue is required.  *Skilling*, 561 U.S. at 381.

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%).  ECF No. 35-1 at 15.  For one thing, this question asked specifically about those who "forced their way into the U.S. Capitol," which suggests a higher degree of culpability than simply entering the Capitol.  For another, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions.  *Id.*  Nor did the question define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has been charged in connection with January 6.  And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box").  In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in

Washington, D.C.  *Skilling*, 561 U.S. at 382.

    **C.**    **The In Lux Research poll does not demonstrate pervasive prejudice in the District of Columbia.**

    Nor does the In Lux Research ("ILR") poll support a presumption of prejudice in this District.  The poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates.  ECF No. 35-2 at 22, 25 (Question 1) (93.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia).  The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions.  The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you."  ECF No. 35-2 at 22 (Question 4).  The percentage of respondents reporting "[a]t least 10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions.  ECF No. 35-2 at 25. And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions.  *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions). The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small different does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

    The ILR survey's summary focuses on responses to "prejudicial prejudgment" questions. ECF No. 35-1, Exhibit A at 2.  But those questions do not show that an impartial jury cannot be

selected in this District.  The questions categorized as "prejudgment questions" were:

(1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty?  Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

(2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, 3) A riot, 4) A protest that got out of control, 5) A rally." (82% of D.C. respondents chose insurrection, attack, or riot.)

(3) "Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?" (71% of D.C. respondents selected "planned in advance.")

(4) "Do you believe The Events of January 6th were racially motivated?"  (40% of D.C. respondents answered in the affirmative.)

ECF No. 35-2 at 22-23.  The last three of these questions do not support a presumption of prejudice because they have little relevance to the potential issues at trial.  The trial in this case would not require jurors to determine whether the events of January 6 were an "insurrection," an "attack," a "riot," or a "protest that got out of control."  Indeed, no defendant has been charged with the offense of insurrection, 18 U.S.C. § 2383, or of violating the Anti-Riot Act, 18 U.S.C. § 2101, in connection with the events of January 6.

Nor would the charges in this case require the jurors to determine whether the defendant "planned in advance" to enter the Capitol or whether the crimes were "racially motivated."  The fact that some D.C. respondents have formed "prejudgments" on those questions does not demonstrate that they cannot follow this court's instructions and decide this case based on the law and the evidence.  And even if it did, the solution would be to exclude prospective jurors who

indicated "prejudgments" during voir dire.  The ILR survey shows that some percentage of respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments."  ECF No. 35-2 at 25  (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed jurisdictions thought entry into the Capitol was planned in advance, and between 11% and 20% believed the events of January 6 were racially motivated).  This demonstrates that a careful voir dire would be necessary in any jurisdiction, and it fails to show that voir dire would be inadequate to weed out biased jurors in the District of Columbia.

Nor do the responses to the first "prejudicial prejudgment" question support a presumption of prejudice.  That question asked respondents whether, in the abstract, they were "more likely" to find a defendant charged in connection with January 6 "guilty or not guilty."  The question failed to ask about any specific crimes.  And it failed to ask respondents whether they could keep an open mind and decide a case based on the law and the evidence if selected as a juror.  Yet the Supreme Court has made clear that the key question in jury selection is whether a prospective juror could "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

When focusing on whether prospective jurors could set aside their "prejudgments" and decide a case fairly, the ILR survey's responses actually undermine Smith's claim that prejudice should be presumed in this district.  When asked whether it would be "possible for [them] to be a fair and unbiased juror for a January 6th Defendant," ECF No. 35-2 at 24, a full 70.13% of D.C. respondents said that they "could," *id.* at 26.  This number was actually *higher* than the affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%).  *Id.*

The ILR survey's administrator asserts that "this representation may actually indicate a

failure to recognize or admit threats to fairness and impartiality." ECF No. 35-2 at 6.  But the survey's findings do not justify that assertion.  The administrator claims that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 23, 26, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 6.  But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial.  *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C. respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial.

Moreover, when asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts.  ECF No. 35-2 at 24, 27  (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia).  Thus, even when controlling for respondents' potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions.  Nor were D.C. respondents significantly more likely to worry about negative consequences to their career or friendships if they were to "find[] a January 6th defendant Not Guilty."  *Id.* at 23, 27 (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia).  The ILR survey does not support the conclusion that an impartial

jury cannot be found in Washington, D.C.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

## V.     The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

Smith also contends that prejudice should be presumed based on pretrial publicity. ECF No. 35, at 16-20. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is

presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate

prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community." *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to Smith's contention, those factors do not support a presumption of prejudice in this case.

## A.     Size and characteristics of the community

Smith suggests (ECF No. 35, at 12) that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*,

but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

### B.      Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Smith is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, although any media characterizations of Smith would be inadmissible, the photos and videos of Smith that have been disseminated would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Smith asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  ECF No. 35, at 18-20.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused on Smith.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Indeed, many of the news stories that the Smith cites were published by media organizations with wide national circulation, not purely local outlets.[3]

---

[3] *See* ECF No. 35 at 18 n.20 (citing "No pictures, no pictures': The Enduring Images from Jan. 6, The Washington Post (Jan. 4, 2022), https://www.washingtonpost.com/nation/interactive/2022/ photos-jan-6-capitol/ (last visited 4/23/22); Chilling Images from the Capitol Riot: Jan. 6 Insurrection in Photos, USA Today (Jan 5. 2022, 10:00 AM), https://www. usatoday.com/picturegallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-

### C.      Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, sixteen months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Smith herself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.      The jury verdict

Because Smith has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

### E.      The Select Litigation Media Analysis

Smith also incorrectly contends that the media analysis conducted by New Exposure at

---

riot/9052798002/ last visited 4/23/22); D. Bennett, et al., 41 Minutes of Fear: A Video Timeline from Inside the Capitol Siege, The Washington Post (Jan. 16, 2021), https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitolsiege/(last visited 5/16/22)

Select Litigation's request supports a presumption of prejudice.  ECF No. 35 at 19-20.  She asserts that "[i]n one year, D.C. newspapers published at least 500 articles about January 6, and local news syndicates broadcast over 7000 stories about the day," which she says is "far more extensive and contemporaneous than [the coverage] in *Skilling*."  *Id.* at 19.  Smith incorrectly compares news coverage of January 6 *as a whole* with coverage of the *specific defendant* in *Skilling*, rather than the larger crime in which he was involved.  Jeffrey Skilling was a former executive of Enron Corporation, and the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name."  *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).  During a 29-month period, "local stations aired an estimated 19,000 news segments involving Enron, more than 1,600 of which mentioned Skilling."  *Id.* at 429.  Thus, the local Houston coverage of Enron's collapse was actually *higher* than the local D.C. coverage of January 6—with an average of more than 1,300 newspaper articles per year and more than 7,800 broadcast stories per year.

Smith acknowledges that "[m]ost" of the coverage of January 6 "has nothing to do with Smith or this prosecution."  ECF No. 35 at 19.  Yet it is *that* coverage—the coverage of Smith herself—that must be compared to stores "about Skilling."  *Id.* at 20.  And the Select Litigation media analysis does not address the coverage of Smith herself, much less establish that such coverage was more extensive than the coverage of Jeffrey Skilling.  Smith expresses concern that she will be prejudiced by this coverage of other January 6 defendants, *id.* at 19, but the defendant in *Skilling* made a similar argument.  *See Skilling*, 561 U.S. at 384-85 (a co-defendant's well-publicized guilty plea shortly before Skilling's trial did not require a presumption of prejudice).  That is therefore no basis on which to treat all the January 6 coverage as if it were coverage of

Smith herself.

Smith also points out that in nine of the 13 months analyzed, the Washington Post ran more news stories about January 6 than did the Atlanta Constitution-Journal and that "for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post*." ECF No. 35 at 20; *see* ECF No. 35-1 at 9. But these raw numbers do not support a claim of prejudice for several reasons. First, the comparison fails to account for the comparative sizes and circulations of the two newspapers. It should not be surprising that a large national newspaper would print more articles on the same topic than a regional newspaper. Second, the analysis does not account for the fact that many Americans receive their news from national sources such as CNN or Fox News, often filtered through social media. Thus, prospective jurors in both Washington, D.C. and Atlanta are not limited to their local newspapers and television broadcast stations and may well have been exposed to much of the same media coverage. Third, simply counting the number of news articles in a given source is not a good way to measure prospective jurors' media exposure. Indeed, the Select Litigation poll shows comparatively small variations in media exposure between Washington, D.C. and Atlanta. According to that poll, 99% of D.C. respondents were aware of the January 6 demonstrations, compared to 93% in Atlanta, and 33% of D.C. respondents had seen "A lot" of coverage, compared to 30% in Atlanta. *Id.* at 13-14. Like the Watergate scandal at issue in *Haldeman*, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia" but one that generated national interest. *Haldeman*, 559 F.2d at 64 n.43.

The Select Litigation analysis also concludes that "the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area." ECF No. 35-1 at 9. But the analysis includes no information

about where these hits came from.  Many of the hits on D.C.-based news sources likely came from readers outside the District itself, such as readers in the Northern Virginia and Maryland suburbs or readers from other parts of the country who were directed to D.C.-based news reporting on social media.  A reader in California, for example, would be far more likely to read about January 6 on the Washington Post than on the Atlanta Journal-Constitution.  Without additional information, this analysis of Internet hits is essentially meaningless.

Additionally, the media analysis fails to support a presumption of prejudice because mere exposure to pretrial publicity does not disqualify a potential juror.  "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381.  The Supreme Court has found no presumption of prejudice even when 98% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box." *Patton*, 467 U.S. at 1029.  The mere fact that Washington, D.C. news outlets have run more stories about January 6 (and received more hits) than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.

## VI.    The Publicity and Reduction of the Jury Pool Caused by Other January 6 Trials in this District Do Not Support a Change of Venue.

Smith argues that she is likely to be prejudiced by the publicity generated by other January 6-related trials that have already occurred or will occur before her November 2022 trial. ECF No. 35, at 22.   Although the trials in those cases have generated media coverage, that coverage was not confined to the District of Columbia and was focused on the defendants in those cases, without mentioning Smith.  Smith cannot show that jurors in this District, carefully selected after a thorough *voir dire* and properly instructed in the law, would be more likely to convict her simply because they were exposed to media coverage of other January 6 trials.  Nor can Smith show that any such asserted prejudice would be meaningfully different in another jurisdiction, given the

national coverage of these trials.  Additionally, by the time Smith has gone to trial, even more time will have passed since the siege at the Capitol on January 6, 2021, and since these initial January 6 trials.  And as more January 6 defendants go to trial, the level of media attention given to each particular trial is likely to diminish.

Smith also argues that, as additional January 6 trials take place, the pool of potential jurors will shrink, making it more difficult to obtain an impartial jury.  But each trial will barely touch the potential jury pool.  Assuming (1) a jury pool of 500,000 out of nearly 700,000 residents, (2) approximately 80 people being summoned per trial, and (3) that no one even summoned for jury service in a January 6 case could be summoned again, over 60 trials will have to occur before *one percent* of the jury pool has been called.  Accordingly, by the time Smith's case proceeds to trial, there will still be hundreds of thousands of potential jurors, who have never been summoned to a January 6 trial, available for *voir dire.*

## VII.   The Voir Dire Process in the First January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, four other January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over each of those trials was able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34-CRC, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022)

And although the government does not yet have transcripts from the *Thompson* trial, the voir dire in the other three cases undermines Smith's claim that prejudice should be presumed.[4]

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt* Trial Tr. 521. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt* Trial Tr. 23, 30. The Court then followed up during individual voir dire and qualified ten prospective jurors who had answered one or more of those bias questions affirmatively but who clarified during individual questioning that they could decide the case fairly and impartially.[5] Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[6]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6

---

[4] The transcripts from the voir dire proceedings in *Reffitt*, *Robertson*, and *Webster* are being submitted under separate cover to the Court and counsel.

[5] *Reffitt* Trial Tr. 60-61 (Juror 1541); 87-88 (Juror 1332); 104-06 (Juror 457); 162-65 (Juror 1486); 188, 191-94, 201 (Juror 1675); 289-90, 297-98 (Juror 365); 301-03, 307-09 (Juror 38); 326-33 (Juror 1655), 427-31 (Juror 344), 436-40 (Juror 1221).

[6] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484). For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14.   It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15.   As in *Reffitt*, the Court followed up on affirmative answers to those questions during individual voir dire, and of the 12 prospective jurors who raised potential concerns about their partiality during voir dire, the Court qualified two who indicated that they could, in fact, be impartial, and struck one for a different reason.[7]  Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[8]

Most recently, in *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 Tr. at 6.  The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 Tr. at 19.  During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at at 32-33, 41-42, 54-56, 63, 65-66.  The presiding judge observed that the Court was able to "qualify 35 jurors after questioning 53 of them" and that only "about 50 percent" of the 18 people stricken for cause were stricken based on an expressed inability to be impartial, as opposed

---

[7] *Robertson* Trial Tr. 23-26 (Juror 1566, struck based on hardship), 64-73 (Juror 254, qualified); 130-36 (Juror 1219, qualified).

[8] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160).  For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

to a connection to the offense.  *Webster*, 4-26-22 Tr. at 6-7.  This means that approximately 9 out 53 prospective jurors (or about 17%) were stricken based on an inability to be impartial, as opposed to some other reason.  The Court also observed that "the actual number of folks that were stricken for cause based on their representation that they couldn't be fair and impartial was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case.  *Id.* at 7.

In these first few trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice."  *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner."  *Id.* at 727.  The percentage of partiality-based strikes in these January 6-related trials— between 16% and 18% of those examined—is far lower than the 62% in *Irvin*.  The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt."  *Murphy*, 421 U.S. at 803.  *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."  *Id.*  As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first few January 6-related trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny Smith's request for a venue transfer and should

instead rely on a thorough voir dire to protect Smith's right to an impartial jury.

**IX.    A Jury Questionnaire Is Not Necessary in This Case.**

Smith also contends in the alternative that this Court should use a jury questionnaire in selecting a jury. (ECF No. 35, at 23 n.23). Smith is incorrect.  Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir dire.[9]  Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-person examination than by use of a jury questionnaire.  "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions." *Mu'Min*, 500 U.S. at 425.  A prospective juror's tone of voice and demeanor are important.  *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions").  Indeed, "[h]ow a person says something can be as telling as what a person says." *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at 433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused.").  And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395.  A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received significant, unfavorable pretrial publicity,

---

[9] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases. *See, e.g., United States v. Stone*, --- F. Supp. 3d ---, 2020 WL 1892360, at *2-3 (D.D.C. Apr. 16, 2020); *United States v. Lorenzana-Cordon*, No. 03-CR-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016).  And one judge has granted a request to use a questionnaire in a January 6 trial that has not yet occurred.  *United States v. Alford*, 21-cr-263, ECF No. 46 at 15 (D.D.C. Apr. 18, 2022) (TSC).  But the practice is not common in this District.

and any potential prejudice due to general media coverage of the events of January 6, 2021 can be adequately probed through in-person voir dire examination.

## <u>CONCLUSION</u>

For the foregoing reasons, Smith's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:       /s/ *Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney, Detailee
Louisiana Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, Louisiana 70130
Brittany.Reed2@usdoj.gov
(504) 680-3031