## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 21-cr-00077 (RDM)** |
| v. | : | |
| | : | |
| MELODY STEELE-SMITH, | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Melody Steele-Smith to a sentence of 60 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Melody Steele-Smith ("Steele-Smith"), a 59-year-old unemployed veteran, who resides in Gloucester, Virginia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Steele-Smith pleaded guilty to one count of violating 18 U.S.C. §1752(a)(1), Entering and Remaining in a Restricted Building. As explained herein, a sentence of incarceration is appropriate in this case because Steele-Smith: (1) approached the Capitol building on the West Front, an area where officers violently battled with the mob of rioters attempting to force their entry inside of the Capitol, and ignored physical barriers that had been pushed to the ground; (2) heard rioters

chanting "we stormed the castle" and used her cellphone to record and post video of the rioters on her Facebook page; (3) repeatedly ignored police officers who were attempting to remove rioters from the Capitol, even after she was struck by a police officer's rubber bullet; (4) entered the office of then U.S. Speaker of the House Nancy Pelosi for nearly five minutes and took pictures; (5) remained inside of the Capitol for approximately 45 minutes before exiting the Capitol; (6) deleted her January 6-related Facebook posts after she left the Capitol; (7) has a criminal history of arrests for assaults and a conviction for battery; and (8) has failed to show either remorse or contrition for her conduct.

The Court must also consider that Steele-Smith's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Here, the facts of and circumstances of Steele-Smith's crime support a sentence of 60 days' incarceration, followed by 36 months' probation, 60 hours of community service, and $500 in restitution in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

*Defendant Steele-Smith's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Steele-Smith traveled to Washington, D.C., from her home in Gloucester, Virginia, along with  three friends, to attend the "Stop the Steal" rally. Steele-Smith drove the group to Washington D.C., arriving at approximately 11:50 a.m., after the "Stop the

Steal" rally. Upon realizing that they had missed the rally, Steele-Smith and her friends decided to walk to the U.S. Capitol Building.

At approximately 12:52 p.m., rioters first breached the outer perimeter of the Capitol Grounds near the Peace Circle at the end of Pennsylvania Avenue (Area A *Image* 1, below), shoving the handful of United States Capitol Police ("USCP") officers stationed at the barriers there out of the way and flooding onto the Lower West Plaza of the Capitol (Area C in *Image* 2, below). At approximately 2:09 p.m., rioters broke through a line of USCP officers standing on the landing of the northwest stairwell. The mob of rioters surged towards the Capitol building.



*Image 1*

Steele-Smith and her friends approached the Capitol grounds from the West Front. While approaching the Capitol Building, Steele-Smith heard protestors saying that the Proud Boys had breached the Capitol and were inside of the building. Undeterred by these statements, Steele-Smith continued to make her way to the Capitol, along with her friends. Steele-Smith heard protestors chanting, "we stormed the castle" and used her cellphone to record the chanting, later posting the video to her Facebook page.

Upon arriving closer to the Capitol building and seeing the scaffolding, Steele-Smith noticed that the Capitol was blocked off due to construction. Steele-Smith observed a door underneath the scaffolding, leading to the inside of the Capitol. After climbing over a wall, Steele-

Smith moved closer to the Capitol, eventually accessing the Senate Wing Door.  At approximately 2:12 p.m., a group of rioters standing outside of the Senate Wing Door began to violently attempt to break into the Capitol by breaking a window and banging on the Senate Wing Door. The first rioters entered the Capitol though the broken window. A minute later, at approximately 2:13 p.m., rioters who entered the inside of the Capitol window successfully broke open the Senate Wing Door, allowing a flood of rioters to enter.

Steele-Smith heard an individual state into a megaphone, "President Trump wants you to push forward, push forward!"  Steele-Smith approached the Senate Wing entrance and walked into the U.S. Capitol at approximately 2:19 p.m., approximately 7 minutes after the breach of the Senate Wing Door.  Steele-Smith continued to use her cell phone to record as she made her entry into the Capitol. *See* Government Sentencing Exhibit 1 at 00:12 to 00:42 and *Image* 2.



*Image 2*
*Still from Government Exhibit 1*

After entering the Senate Wing Door, Steele-Smith walked to a nearby hallway leading into the Crypt.  After pushing through a crowd of rioters in the Crypt, Steele-Smith ascended a stairwell to the second floor of the Capitol, which led to the suite of  the Speaker of the House of

Representatives, Congresswoman Nancy Pelosi.  Steele-Smith walked the hallway of the suite as rioters entered various offices, and she continued to take pictures.

At approximately 2:38 p.m., Steele-Smith entered the office of Speaker Pelosi.  Upon entering, Steele-Smith took pictures of the Speaker's office and she posted the photographs to her personal Facebook page.  Steele-Smith's reflection can be seen in one of the photographs featured in Speaker Pelosi's office. *See* Image 3.



*Image 3*

Steele-Smith wore the same white headband, orange jacket, and red, white, and blue scarf that she wore while outside of the Capitol.  *See* Image 4.



*Image* 4

Steele-Smith spent approximately five minutes inside of Speaker Pelosi's office before exiting.  Steele-Smith entered the Rotunda where she continued to take photographs with her cell phone. *See* Image 5.



*Image 5*

While inside the Rotunda, police officers dispensed tear gas in an effort to remove rioters. Steele-Smith remained inside of the Rotunda after the tear gas was dispensed.  *See* Government Sentencing Exhibit 2 and *Image* 6.



*Image 6*

After approximately 45 minutes inside of the Capitol, Steele-Smith was ushered out of the Capitol by police officers.

*Social Media Posts*

After leaving the Capitol, Steele-Smith used Facebook to post pictures of herself on Capitol grounds, including the inside and outside of the Capitol.   She posted a video of the crowd of protestors standing outside of the Capitol, chanting "we stormed the Capitol."   In addition to the video, Steele-Smith posted "we stormed the Capitol" to her page.  *See* Image 7.



*Image 7*

She also used her Facebook page to post pictures of herself while she was inside of Speaker Pelosi's office. *See* Images 3 and 4.

The following day, Steele-Smith made another post of what occurred on January 6. *See* Image 8.



*Image 8*

Steele-Smith subsequently deleted the posts and videos related to January 6 within days of leaving the Capitol.

*Steele-Smith's Post-arrest Interview with the FBI*

On January 21, 2021, Steele-Smith gave a voluntary post-arrest interview to the FBI. During the interview, she admitted traveling to Washington D.C. with friends to attend the rally on January 6, 2021, but she did not attend the rally because she arrived late. She, instead, decided to walk around, waiting to hear whether President Trump would speak at another rally.

While Steele-Smith was on the outside of the building, she heard someone say that the "good old boys" broke into the front of the Capitol. Later in the interview, Steele-Smith clarified the "good old boys" were the Proud Boys, a group she had never heard of prior to January 6.

Steele-Smith also heard people chanting "we stormed the castle" and she decided to make a post on Facebook stating, "we stormed the castle."

Steele-Smith admitted to seeing fencing on the Capitol grounds.  She admitted to seeing that the Capitol grounds were blocked off.  Steele-Smith explained how she approached the Capitol and stepped over a short wall to get closer to the Capitol grounds.  Upon approaching the Capitol, Steele-Smith claimed hearing protestors state, "President Trump wants you to push forward, push forward!"

When asked if she witnessed any violence on January 6, Steele-Smith denied seeing any violence.  However, she admitted seeing rioters exposed to tear gas.  She described seeing a man pour water over his face because he had been teargassed.   Smith recalled being exposed to teargas while she was inside of the Rotunda.  Smith also recalled being shot in the ankle with a rubber bullet by police officers attempting to rid rioters from the Capitol grounds.

Steele-Smith also admitted to entering the office of Speaker Pelosi, and taking pictures of Speaker Pelosi's office. She claimed that she and the others in the building just wanted to talk to Speaker Pelosi and the congressmen because they were mad. She told FBI that she did not know why the members of Congress were afraid of the presence of the rioters.

Steele-Smith stated that she departed the Capitol when the police began ushering people out, and after leaving the Capitol, she used her Facebook page to post pictures and videos of her time at the Capitol on January 6, claiming that she did so because she was unable to respond to the numerous messages that she received from her followers.

### The Charges and Plea Agreement

On January 19, 2021, the United States charged Steele-Smith by criminal complaint with violating Title 18, United States Code, Section 1752(a), Entering and Remaining in a Restricted Building or Grounds, and Title 40, United States Code, Section 5104(e)(2), Entering and Remaining in Certain Rooms in the Capitol Building.

On January 20, 2021, law enforcement officers arrested Steele-Smith at her home in Virginia. On February 3, 2021, the United States charged Steele-Smith by a five-count Indictment with violating Title 18, United States Code, Section 1512(c)(2) and (2), Obstruction of an Official Proceeding and Aiding and Abetting (Count One), Title 18, United States Code, Section 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds (Count Two), Title 18, United States Code, Section 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building (Count Three), Title 18, United States Code, Section 5104(e)(2)(C), Entering and Remaining in Certain Rooms in the Capitol Building (Count Four), and Title 40, United States Code, Section 5104(e)(2)(D), Disorderly Conduct in a Capitol Building. On November 1, 2022, pursuant to a plea agreement, Steele-Smith pleaded guilty to Count Two of the Indictment, charging her with a violation of Title 18, United States Code, Section 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. By plea agreement, Steele-Smith agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Steele-Smith now faces a sentencing on a single count of violating Title 18, United States Code, Section 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds.  As noted by the plea agreement and the U.S. Probation Office, Steele-Smith faces up to 1 year of imprisonment and a fine of up to $100,000. Steele-Smith must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Steele-Smith's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | - 2 |
| Total Adjusted Offense Level | +4 |

*See* PSR at ¶¶ 30-38.

The U.S. Probation Office calculated Steele-Smith's criminal history as a category I. PSR at ¶ 42. Accordingly, the U.S. Probation Office calculated Steele-Smith's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 79-81. Steele-Smith's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 60 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Steele-Smith's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Steele-Smith, the absence of violent or destructive acts is not a mitigating factor. Had Steele-Smith engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Steele-Smith's case is her entry into Speaker Pelosi's office, a sensitive area of the Capitol.  While inside of Speaker Pelosi's office, Steele-Smith took photographs of Speaker Pelosi's office, and subsequently posted photographs of the Speaker's office on her Facebook page.

The second most important factor is Steele-Smith's statements on Facebook after January 6, and her deletion of her Facebook account after making her January 6 posts.  While on Capitol

13

grounds and after leaving the Capitol, Steele-Smith promoted the conduct of the protestors and rioters on her Facebook page. She celebrated their conduct by posting video of the rioters proclaiming that they were "storming the Capitol." Steele-Smith even made a separate post to highlight her own involvement in the breach, stating "we're storming the Capitol." After leaving the Capitol, Steele-Smith attempted to mitigate the violence that occurred at the Capitol by describing what happened on January 6 as having been peaceful and describing the media's portrayal as being untruthful. She subsequently deleted her Facebook page, claiming that she was unable to keep up with all of the comments regarding January 6.

The third most important factor is the fact that Steele-Smith has not demonstrated genuine remorse for her conduct on January 6. While at the Capitol, Steele-Smith ignored the fencing and barricades signaling to protestors that their presence was not welcomed on January 6. Steele-Smith entered the Senate Wing Door, shortly after the breach of the Capitol. Despite being tear-gassed and shot with a rubber bullet, Steele-Smith praised what happened on January 6 after she left the Capitol. During her interview with the FBI, Steele-Smith failed to appreciate the seriousness of entering the Capitol and Speaker Pelosi's office, stating that she merely wanted to talk to Speaker Pelosi because she was "mad." She failed to comprehend why the members of Congress were fearful during the events of January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Steele-Smith

As set forth in the PSR, Steele-Smith's criminal history consists of five misdemeanor arrests for acts of violence. Two of the five arrests resulted in convictions. In 1996, Steele-Smith was convicted of battery. In 2005, Steele-Smith was convicted of assault and battery. The three

remaining offenses were either dismissed or resulted in not guilty verdicts. Steele-Smith was also convicted for Reckless Driving Accident.  PSR at ¶¶ 39-48.

While Steele-Smith's convictions are not recent, these convictions are concerning because they stem from acts of violence.  Steele-Smith's most recent arrest for assault occurred in 2017. While the government notes that this arrest resulted in a not guilty verdict, Smith has a history of violent conduct.  Her history of recidivism is particularly concerning in light of the conduct that occurred at the Capitol on January 6.  Despite her involvement with the criminal justice system, Steele-Smith went to the Capitol on January 6.  Steele-Smith's lack of remorse for what happened on January 6, coupled with her history of recidivism, demonstrate the likelihood that Steele-Smith could engage in similar conduct the next time her chosen presidential candidate does not win an election.

Steele-Smith has been compliant with her conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As noted above, Steele-Smith has not expressed remorse for her actions on January 6. The government is aware of no such statement of remorse when Steele-Smith was interviewed by law enforcement after her arrest or during the time preceding the sentencing hearing. Accordingly, the Court may reasonably conclude that deterrence is warranted to prevent Steele-Smith from committing similar acts again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Steele-Smith based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Steele-Smith has pleaded guilty to Count Two of the Information, charging her with Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent.

Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, or more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the

Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration.

In *United States v. Courtright,* No. 21-cr-72 (CRC), the defendant pleaded guilty to 18 U.S.C. § 1752(a)(1) and was sentenced to 30 days' incarceration. Similar to Steele-Smith, Courtright entered a sensitive space inside the U.S. Capitol and entered the Senate floor. Courtright took a "members only" sign and was asked to return it, and stood by as others around her destroyed property. Similar to Steele-Smith, Courtright expressed no remorse for her actions on January 6.

In *United States v. Kelly O'Brien,* 21-CR-633 (RCL), the defendant pleaded guilty to 18 U.S.C. § 1752(a)(1).  O'Brien's conduct on January 6 was remarkably similar to that of Steele-Smith. Like Steele-Smith, O'Brien entered the Speaker's office suite and posted proudly about rioters' conduct on Facebook, calling them "brave patriots." Both defendants destroyed evidence, deleting posts from their Facebook accounts January 6. Both defendants have been convicted of misdemeanors, though O'Brien had a criminal history category of III whereas Steele-Smith has a criminal history of I. O'Brien was sentenced to a term of 90 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[2] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Steele-Smith must pay $500 in restitution, which reflects in part the role she played in the riot on January 6.[3] Plea Agreement at ¶ 12. As the plea agreement reflects,

---

[2] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[3] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Steele-Smith's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a sentence of 60 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing his acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      */s/ Brittany L. Reed*
    BRITTANY L. REED
    Trial Attorney – Detailee
    La. Bar No. 31299
    650 Poydras Street, Ste. 1600
    New Orleans, Louisiana 70130
    Telephone: (504) 680-3031
    Brittany.Reed2@usdoj.gov

       */s/ Ashley Akers*
    Ashley Akers
    Trial Attorney
    MO Bar No. 69601
    Detailed to the U.S. Attorney's Office
    601 D Street NW
    Washington, DC 20001
    Telephone: (202) 353-0521
    Ashley.Akers@usdoj.gov

## **<u>CERTIFICATE OF SERVICE</u>**

On this 7th day of June, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div align="center" style="float:right">

 /s/ *Brittany L. Reed*
Assistant United States Attorney

</div>