# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 21CR77:(RDM) |
| MELODY STEELE-SMITH, | |
| Defendant. | |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

Melody Steele-Smith ("Melody or Ms. Steele-Smith") will be before the Court for sentencing after having accepted responsibility for entering the Capitol building on January 6, 2021, when she was aware it was restricted, in violation of 18 U.S.C.§ 1752(a)(1).

On January 6, Ms. Steele-Smith traveled to Washington, D.C. from her home in Gloucester, Virginia, with friends in order to hear President Trump speak. Having arrived in downtown D.C. later than expected, the group missed the speeches at the Ellipse. People in the crowd said that President Trump promised he was going to meet the rally-goers at the Capitol. Eager for a chance to see Mr. Trump, Ms. Steele-Smith and her friends followed the crowd from the Ellipse to the Capitol grounds. When Ms. Steele-Smith arrived at the Capitol grounds, she heard that the President might speak again. So she moved forward with the crowds, hoping to catch a glimpse of the President. She did not carry any weapons, flags, or signs. After all, her only intention in traveling to the rally was to support the President and to hear him speak. To her regret, she followed the swell of the crowd inside, entering the building

through open Senate Wing doors. While inside the building, Ms. Steele-Smith did not engage in any violence or destruction of property. To the contrary, she calmly passed by many police officers without incident or interaction. Ultimately, when police officers told her to leave, she left peacefully. A few weeks later, she was interviewed by law enforcement and admitted to all of her conduct. Following her arrest on July 20, 2021, Ms. Steele-Smith has been perfectly compliant with conditions of release for two years.

Ms. Steele-Smith has reviewed the Pre-Sentence Report (PSR) and offers no objection to the guideline range of 0 to 6 months. For the reasons that follow, Ms. Steele-Smith, through counsel, submits that a sentence of 12 months of probation along with the restitution obligation is sufficient but no greater than necessary to meet the goals of sentencing.

## I. The sentencing factors support a probationary sentence.

### A. Ms. Steele-Smith's history and characteristics show that probation is appropriate.

Ms. Steele-Smith, now sixty years old, has overcome significant obstacles in her life. Her life up to this point, her character as described by family and friends, and her conduct since January 6 show that a period of incarceration is unwarranted.

### i. *Ms. Steele-Smith grew up in an abusive household, a dynamic that resurfaced in her first marriage.*

Melody Steele-Smith was born sixty years ago to married parents, who raised her in rural Muhlenberg County, Kentucky. Her father, a coal miner, and mother, a bus driver, worked hard to provide for their family. Though their circumstances were not destitute, the family was working class, and often had trouble paying all of the

bills. On top of this economic insecurity, Ms. Steele-Smith's childhood home life was chaotic. Her father was an alcoholic, and physically and emotionally abused her and her mother.[1] His frequent outbursts of rage, yelling, and breaking the family's possessions rocked their family home. Though her father was never formally diagnosed, Ms. Steele-Smith suspects that he may have had untreated bipolar disorder. Her relationship with her mother was strained as well; she was often overwhelmed and unable to attend to Melody's needs. After years of tumult, her parents finally divorced when she was around nine or ten years old. Melody spent the remainder of her childhood living primarily with her mother, but was shuffled back and forth between her parents' homes once she started high school.

When Ms. Steele-Smith was 21 years old, she married Mickey Bowers because she was pregnant with their son. Their marriage was as unstable as her parents' had been. Mr. Bowers, like Melody's father, was an alcoholic. After three years filled with emotional and physical abuse, they divorced. Mr. Bowers ultimately passed away from alcoholism at age 43.

In spite of her traumatic first marriage, Ms. Steele-Smith has built a stable partnership with her current husband of 23 years, Darryl Smith. Their blended family includes Mr. Smith's two sons from a previous union, Ms. Steele-Smith's first son with Mr. Bowers, and her younger son who was born between her marriages with Mr. Bowers and Mr. Smith. The couple devoted themselves to uniting their families

---

[1] PSR ¶ 52.

and raising the children in a secure and cohesive home, though the stability of their home life has been challenged by their oldest son's drug and alcohol addiction.[2]

### ii. Ms. Steele-Smith enlisted in the Navy and faced painful separation from her young children and military sexual trauma.

In the 1990s, Ms. Steele-Smith held a variety of blue-collar jobs while struggling to support her two young boys as a single mother. When her job at a factory ended in 1996, she was unable to find work. Eager to find stable employment and motivated to serve her country, Ms. Steele-Smith enlisted in the Navy in September 1997. When she enlisted, she thought would only be separated from her six and twelve-year-old sons for a brief period. Instead, Ms. Steele-Smith was separated from her children for two years while stationed in Japan, Honduras, and finally Puerto Rico.[3] Although she struggled with the separation, Ms. Steele-Smith positively contributed to the Navy, helping with hurricane relief efforts in Honduras and the Gulf Coast, and receiving multiple achievement awards, including a humanitarian award for "Service on Saturdays" volunteering at nursing homes.[4] Below is a photo of Ms. Smith when she first enlisted:

---

[2] Ms. Steele-Smith's relationship with her now adult son has been tumultuous. As an adult, he came to the home several times in an inebriated state and instigated disputes with Ms. Steele-Smith and Darryl, which resulted in three contacts with the family court. PSR ¶ 44-46.
[3] PSR ¶ 68.
[4] *Id.*



,

Ms. Steele-Smith's time in the Navy was physically challenging. She was assigned to work in heavy equipment, and was often given more responsibility than her rank designated, without promotion. In 1998, Ms. Steele-Smith fell from a piece of equipment and twisted her right knee. She was originally treated with Motrin and some exercises, but her injury turned out to require surgery. She underwent two operations, but her knee never fully recovered. Ms. Steele-Smith continues to experience chronic pain and limited mobility that negatively impacts her quality of life.[5]

Ms. Steele-Smith's time in the Navy was also marked by emotional difficulties. She struggled with guilt about leaving her young boys for so long, and worried incessantly about them. She felt that she had abandoned them by enlisting and was therefore failing as a mother. These emotional struggles were compounded ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████. Ms. Steele-

---

[5] PSR ¶ 57.
[6] PSR ¶ 61.

Smith struggled to overcome this trauma for years. ██████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████, however, she received

no treatment. Ms. Steele-Smith was assessed for depression and stress at the Naval

Hospital in Puerto Rico, but she remained in the service for another two months. Ms.

Steele Smith was finally honorably discharged from the Navy on October 5, 1999.

### iii. Ms. Steele-Smith experienced mental health struggles exacerbated by trauma from her childhood, first marriage, and military service.

Ms. Steele-Smith has spent decades recovering from the effects of her trauma

and related mental health struggles. Shortly after her honorable discharge from the

Navy, she was finally able to seek the treatment she needed. Ms. Steele-Smith was

diagnosed with bipolar disorder, depression, and anxiety at the Maine Veteran's

Affairs Medical Center in 1999.[7] Here, she finally gained access to the services she

needed to begin to heal, and continued periodically receiving mental health treatment

through the VA for the next two decades.

Notably, Ms. Steele-Smith has re-engaged with individual therapy since her

arrest for the instant offense, and has been attending weekly sessions near her home

in Gloucester for over two years.[8] This consistent access to mental health treatment

has enabled Ms. Steele-Smith to continue to take care of her mental health and cope

---

[7] PSR ¶ 60.

[8] PSR ¶ 57.

with life's challenges, such as the recent death of her mother.[9] She is committed to continuing in therapy following the conclusion of her case. *Id.*

### iv. Ms. Steele-Smith faces an array of physical health problems that have worsened as she ages.

Ms. Steele-Smith suffers from a variety of physical health issues. Her years of manual labor, especially working heavy equipment in the Navy, have taken a toll on her body. Ms. Steele-Smith experiences chronic back pain, and has undergone two surgeries. She still depends on regular steroid injections to mitigate her back pain. Ms. Steele-Smith has also suffered from knee problems since her injury while serving in the Navy. Much like her back problems, her knee pain and limited mobility have persisted even after multiple surgeries. Ms. Steele-Smith also copes with shoulder and foot pain that restrict her ability to exercise and negatively impacts her quality of life.

In the past year, Ms. Steele-Smith was diagnosed with chronic obstructive pulmonary disease (COPD) and rheumatoid arthritis.[10] She depends on multiple medications to manage her persistent COPD symptoms. To better care for her health, Ms. Steele-Smith quit smoking despite decades as a pack-a-day smoker. Her rheumatoid arthritis causes frequent painful swelling of her hands, and requires additional medications reduce the inflammation. Though she has not allowed her health issues to stop her from living a fulfilling life, Ms. Steele-Smith has had to take many precautions to manage her chronic conditions.

---

[9] PSR ¶ 62.
[10] PSR ¶ 57.

### v. *Ms. Steele-Smith serves her community and family.*

Ms. Steele-Smith's friends and family members consistently describe her as a caring, kind, and giving individual, who "has always been a reliable person for others to count on for help."[11] A talented artist and handywoman, she puts her gifts to good use in service of her community and family. Ms. Steele-Smith has often turned to artistic expression for solace in difficult times, and she shares her talent with others as well. For many years, she has designed and painted sets for her church's theatrical productions.[12] Her decades of manual labor have also shaped her into a knowledgeable and effective handywoman. A relative described her as someone who "doesn't shy away from hard work…ever!" and many a friend and family member have benefitted from her efforts.[13] She is known as "the first to step up for the hard physical labor," and has helped friends and relatives with projects including repairing a leaky roof, replacing light switches and ceiling fans, and installing a new deck, and helping to refurbish furniture, all while refusing payment for her work and even fronting the cost of materials.[14] Below is a picture of a cabinet that Ms. Steele-Smith refurbished for a friend:

---

[11] Letters of Debra Reiss & Darryl Smith.
[12] Letter of Darryl Smith.
[13] Letter of Angela Bryant.
[14] Letters of Angela Bryant & Sara Gossett.



Ms. Steele-Smith's work as an artist and handywoman barely scratches the surface of her contributions to her community. She has always had a strong commitment to service, starting from her time in the Navy where she was known as "a volunteer among volunteers."[15] Now, despite her health issues, she routinely donates blood to the Red Cross.[16] Ms. Steele-Smith also dedicates many hours to various organizations in her local Gloucester area and beyond, helping with community clean-up days, church activities, and children's programs.[17] Whenever she helps with a new project or program, she always "encourages neighborhood children to attend and get involved."[18] Ms. Steele-Smith's compassion for others extends even to animals.[19] She regularly sends money and other donations to the humane society, and is the caring owner of two rescue dogs herself.[20]

---

[15] Letter of Darryl Smith.
[16] Letters of Debra Reiss & Darryl Smith.
[17] Letter of Darryl Smith.
[18] *Id.*
[19] Letters of Sara Gossett & Debra Reiss.

[20] *Id.*

Though Ms. Steele-Smith is known as an artist, handywoman, blood donor, woman of faith, and wearer of still many more hats in her community, her most treasured role is being a mom and grandma. Ms. Steele-Smith "loves her two boys and granddaughter more than the air she breathes."[21] She dedicated so many hours of volunteering at her youngest son's school that she was recognized with a parent volunteering award.[22] To this day, she continues to spend many hours volunteering at her granddaughter's school.[23] She is one of the most important people in her granddaughter's world, and Ms. Steele-Smith provides her with much-needed support "every minute of every day."[24] Thanks to Ms. Steele-Smith, her granddaughter's childhood has been nothing like her own. While a young Ms. Steele-Smith once faced neglect and abuse, she now fills her granddaughter's days with shopping trips, swimming at the pool, and visits to the zoo.  Ms. Steele-Smith and her grandkids:



---

[21] Letter of Laura Rushing.
[22] Letters of Debra Reiss & Darryl Smith.
[23] Letter of Darryl Smith.
[24] Letter of Debra Reiss.



Ms. Steele-Smith's other family members and friends know her as a bedrock of emotional support. She has maintained strong bonds with loved ones from her Kentucky roots, even among people she is rarely able to visit. Her cousin, with whom Ms. Steele-Smith checks in regularly despite the hundreds of miles between them, describes her as "a godsend," and "a big reliever of stress for me just to have her listening ear."[25] Other friends from Kentucky characterize Ms. Steele-Smith as a good-hearted role model and someone who "cares deeply for all people; strangers, family, and friends alike."[26] Whether by phone calls, texting, or in-person visits, Ms. Steele-Smith's loved ones can count on her to be there for them through good times and bad. In sum, Ms. Steele-Smith's small but loyal community of friends and family know her as a generous, kind, and gentle woman who has had to overcome significant adversity.

---

[25] Letter of Angela Bryant.
[26] Letters of Sara Gossett & Laura Rushing.

### vi. Ms. Steele-Smith's conduct since January 6

Ms. Steele-Smith's multiple letters of support offer diverse perspectives on her many gifts, positive attributes, and roles in her community. The letters share another common thread in that they describe Ms. Steele-Smith's regret for the events of January 6th. Indeed, her friends and family members emphasize that Ms. Steele-Smith "does not have a violent bone in her body" and is "very apologetic" for what transpired.[27] These private expressions of remorse to her loved ones—as well as her conduct since January 6—demonstrate that Ms. Steele-Smith understands that what happened on January 6 was wrong. Perhaps more importantly, she understands how her actions—though non-violent—contributed to the chaos of that day. A sentence of imprisonment is not needed to deter Ms. Steele-Smith from ever entering a restricted space again.

### B.   The nature and circumstances of the offense support a probationary sentence.

Ms. Steele-Smith first learned about the "Save America" rally from a friend's Facebook post. Ms. Steele-Smith reached out to her friend and arranged to drive to the district with her friend and her friend's brother and sister. The group of friends were supporters of President Trump and eager to attend the rally to show their support for the President. Prior to January 6, there was absolutely no talk among this group of fighting or violence. To the contrary, Ms. Steele-Smith and her friends

---

[27] Letters of Laura Rushing & Darryl Smith.

looked forward to a peaceful rally. For her part, Ms. Steele-Smith had never been to Washington, D.C., before, and she looked forward to taking in the sights.

Ms. Steele-Smith and her friends arrived in D.C. later than expected and were disappointed to learn that they missed the speeches at the Ellipse. By the time they arrived, the crowd was moving towards the Capitol building. Ms. Steele-Smith heard from others in the crowd that the President was going to join the crowds at the Capitol. Eager to catch a glimpse of the President, she moved with the crowds towards the building, snapping pictures and taking videos. At one point, she saw a well-dressed man she assumed was a member of congress or some other official, based on the way he was dressed. She snapped a picture of the man, texted it to her friend, and proceeded to follow the man towards the building.

**Picture Ms. Steele-Smith took on her phone**:



While in the crowd, she heard chants and yelling, including other rally-goers shouting "President Trump wants you to push forward, push forward!"[28] At this point, unfortunately, Ms. Steele-Smith did not follow her instinct to leave the situation and instead moved with the crowed into the building through the Senate Wing doors, which protestors had opened prior to Ms. Steele-Smith arriving at the doors.



**Ms. Steele-Smith entering through Senate Wing doors**.

Once inside, she turned left and proceeded down the hallway. After about two minutes, she interacted with police officers, peacefully, as depicted in CCTV footage below:



---

[28] PSR ¶ 20.

Not knowing her way around, she followed a stream of people to the Speaker's office. She noticed damage in the office, snapped some more photos, and left. She did not herself damage any property. She then proceeded on to the Rotunda. CCTV footage captured Ms. Steele-Smith taking photos of the art in the Rotunda:



As she moved around the rotunda, she also helped pick up rope that had fallen:





When Ms. Steele-Smith was in the Rotunda, police officers asked her to leave for the first time. Not knowing how to exit, she asked the officers, who showed her the exit. Ms. Steele-Smith left the building without incident.

During the time Ms. Steele-Smith was in the building, she never once spoke disrespectfully to an officer (or anyone) and she never once disobeyed a command to leave. She did not chant, shout, or even jostle anyone. To the contrary, not knowing how to exit once she was inside, she moved with the swell of the crowd.

Ms. Steele-Smith has admitted it was wrong to enter the building and the Speaker's office. She has experienced significant consequences for her trespass: she was embarrassed by the local publicity surrounding her arrest, she has pleaded guilty to a criminal offense, and she has been under conditions supervision for over two years.

### C.   A probationary sentence will meet the other goals of sentencing.

A probationary sentence will serve as a just punishment and adequate deterrent. Ms. Steele-Smith has already experienced serious consequences for her

actions. Furthermore, she appreciates the fall-out of January 6—she has seen the videos of the chaos of that day and she has seen that ordinary people like herself who crossed a line by following the former president and others are losing their livelihoods and going to prison. She has no desire to attend any type of political rally again and she certainly will never allow herself a lapse of judgment similar to what occurred on January 6.

With respect to general deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[29] In short,

---

[29] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.   Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

there is little empirical support for the prospect that a period of confinement will be any more effective at deterring would-be trespassers from committing the offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

Finally, the requested sentence will avoid unwanted disparities with other similarly situated and more culpable January 6 defendants. For example:

> *United States v. Matthew Wood*, 1:21CR223 (APM), the defendant was one of the first inside the building, joined a mob pursuing officers up the stairs, spent 80 minutes inside the building, and entered the Speaker's suite of office, in addition to far more culpable conduct.[30] Defendant Wood pleaded guilty to obstruction of justice and the Honorable Judge Mehta imposed a probationary sentence, notwithstanding the government's request for 57 months incarceration.

> *United States v. Wilson,* 1:21CR578 (APM), the defendant entered the Capitol through a broken window, posted pictures of himself inside the building to Facebook, entered Speaker Nancy Pelosi's office and took video inside, remained inside the office for five minutes, traversed almost the entire length of the Capitol, and lied to FBI agents after about his participation in the riot.[31] By contrast, Ms. Steele-Smith entered through an open door and did not lie to law enforcement. Defendant Wilson was sentenced to 24 months' probation, notwithstanding the government's request for 14 days incarceration.

> *United States v. Hentschel*, 1:21CR667(FYP), the defendant encouraged and celebrated the riot on social media moments before entering the Capitol, bragged and boasted on social media about her participation in

---

[30] 1:21CR223, Government's Sentencing Memo, ECF. No. 55.
[31] 1:21CR578. Government's Sentencing Memo, ECF. No. 49.

January 6, and boasted (evidently falsely) that she broke into Speaker Pelosi's office and stole beer.[32] The government request three months incarceration and the Honorable Judge Pan imposed 24 months' probation.

*United States v. Marquez*, 1:21CR136 (JCC), the defendant attended the rally after which he headed to the Capitol and recorded himself on the terrace urging others to "climb the wall." He then entered the Capitol and filmed a four minute of himself inside, which he posted to social media. Marquez repeatedly interacted with officers, urging one to "fist bump" him. He entered Senator Merkley's hideaway office and, with 20 other rioters, sat at the conference table. His cell phone video captured rioters chanting, smoking, and banging on the table. At one point, he held his vape pen up to the camera and remained in the office, taking hits off his vape pen in a "jovial" manner. He remained in the Senator's office for 10 minutes.[33] The Honorable Judge Contreras imposed a probationary sentence.

*United States v. McAuliffe*, 1:21CR608 (RCL), the defendant posted pictures of himself in the Capitol along with boastful comments. He also went into Senator Merkley's conference room, remained there for approximately for 30 minutes and remained there while others were smoking marijuana.[34]The Honorable Judge Lamberth sentenced the defendant to probation with a condition of home confinement.

*United States v. Brian Sizer*, 22CR376 (JEB), the defendant observed numerous rioters climbing the scaffolding and walls and attempting to break windows. He took over 90 photos on his phone of restricted areas of the Capitol. He entered through the smashed Parliamentarian Door. At one point, instead of leaving the Capitol building, he turned the opposite direction of the exit and entered a Senate office. He took a picture of himself sitting in an office chair with his feet up. Finally, unlike Ms. Steele-Smith, he was not truthful about his conduct when interviewed by law enforcement.[35] Though he breached a Senate office, the district judge imposed a probationary sentence.

*United States v. Juliano Gross*, 1:22CR56 (APM), the defendant was sentenced to 24 months probation despite having penetrated the Senate Gallery and encouraging rioters onto the Senate Floor while live

---

[32]1:21CR667, Government's Sentencing Memo, ECF. No. 43.

[33]1:21CF136, Government's Sentencing Memo, ECF. No. 29

[34] 1:21CR608, Government's Sentencing Memo, ECF. No. 37.

[35] 1:21CR376, Government'. Sentencing Memo, ECF. No. 29.

streaming his conduct on TikTok while chanting "Our Capitol" and other slogans. Following January 6, he posted images on social media that glorified rioters and blamed "Antifa" for the violence.[36] By contrast, Ms. Steele-Smith did not encourage other rioters and did not falsely blame others for her conduct.

Meanwhile, the few cases the government points to are easily distinguishable. For example, the government points to *United States v. Jancart* and *United States v. Rau*. In each of these cases, the men prepared for violence: Jancart wore a gas mask and carried a 2-way radio and Rau had Kevlar gloves and a medical kit. The both entered the capitol and screamed threats at the police. Finally, they espoused revolution after January 6, suggesting the potential for future violence.[37]

In contrast to Jancart and Rau, Ms. Steele Smith came in plain clothes and did not scream at officers. The government's cases are inapposite and underscore that the cases cited above by the defense support that incarceration would create unwarranted disparity. *See also United States v. Lollis*, 1:21CR671 (BAH) (imposing 36 months' probation with condition of home confinement on defendant who, like Ms. Steele-Smith, followed rioters through the Senate Wing doors, and who asked a police officer whether he was on the "same team" and then taunted the officer when he did not respond); *United States v. Torrens*, 1:21CR204 (BAH) (imposing 36 months' probation with condition of home confinement on defendant who entered through Senate Wing doors as others climbed through windows nearby and entered various parts of the Crypt); *United States v. Amy Schubert*, 21-cr-588 (ABJ) (defendant

---

[36] 1:22CR56(APM), Government's Sentencing Memo, ECF. No. 24.

[37] 21CR148 (JEB) and 21CR467(JEB), Government's Sentencing Memos, ECF. Nos. 29, 13.

sentenced to 18 months' probation where defendant entered congressional meeting room and took a "selfie"); *United States v. Anthony Mariotto*, 21-cr-094 (RBW) (defendant entered Senate Gallery and photographed himself inside, sentenced to 36 months' probation); *United States v. Joseph Zlab*, 21-cr-389 (RBW) (defendant who entered House Appropriations Room and was close to the House Chamber sentenced to 36 months' probation).

While no two cases have perfectly analogous facts, these cases show that that the sentence proposed by the defense is not out of step with other January 6 cases in which defendants engaged in similar—if not more culpable conduct—than Ms. Steele-Smith.

**D. Application of the government's factors supports probation.**

In other January 6 cases, the government has identified nine relevant sentencing factors:

> While looking at the defendant's individual conduct, we must assess such conduct on a spectrum and with an eye towards its larger consequences. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive

nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.[38]

Application of the government's factors show that probation is appropriate for Ms. Steele-Smith. As set forth herein and in the PSR, Ms. Steele-Smith peacefully traveled to Washington, D.C. to participate in a rally hosted by the President. She did not travel with an extremist or militant group or bring any weapons to the Capitol. She entered through doors that had already been broken. She did not engage in violence or destruction. She did not espouse violence on social media. She cooperated fully with law enforcement. While she freely admitted to agents that she deleted Facebook, she explained that she deleted it because she could not keep up with the barrage of comments and posts. She pleaded guilty without reservation.

Of course, the government's proposed factors are just suggestions. However, if the Court accepts the government's invitation to apply these factors, it is clear that these factors as well as the 3553 (a) factors support a sentence of probation for Ms. Steele-Smith.

## Conclusion

For the foregoing reasons, Ms. Steele-Smith respectfully requests that the Court impose the sentence recommended by U.S. Probation, that is, a sentence of 12 months'

---

[38] *See, e.g., United States v. Buckler*, 1:22CR162(TNM), ECF No. 26, Gov. Sentencing Memo at 26 (requesting 30 days of incarceration for defendant who entered the Capitol twice, the first time by climbing through a broken window and who entered a Senator's private office and was captured on video in the office while another individual smoked marijuana). Mr. Buckler was sentenced to probation with a condition of home incarceration.

probation and restitution. Ms. Steele-Smith concurs with the PSR's determination that she does not have the ability to pay a fine in addition to restitution.


Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DFENDER


_____/s/_____
Elizabeth Mullin
Assistant Federal Public Defender
Office of the Federal Public Defender
 for the District of Columbia
625 Indiana Avenue, N.W.
Washington, D.C. 20004